NELSON MORRIS ET AL., APPELLANTS, V. WASHINGTON
COUNTY ET AL., APPELLEES.

FILED JUNE 9, 1904.   No. 13,636.

1. **Drainage.** Where a ditch constructed jointly by two counties has proved insufficient to drain properly the lands it was intended to benefit, the county board of one of the counties has the power to adopt a new system of drains of which the old ditch, straightened, widened, altered or deepened, shall form a part, and assess the cost of location and construction upon the lands benefited, upon the proper proceedings for that purpose being taken; and the fact that prior to the adoption of the new scheme of drainage it had failed to clean out the old ditch for several years is immaterial.

2. **Powers of County Board: CONSTITUTIONAL LAW.** The provisions of the drainage law, sections 1-28, article I, chapter 89, Compiled Statutes, confer power upon the county board to provide means for raising a fund from which to compensate landowners whose property has been taken or damaged in the construction of the proposed improvement, and its provisions do not violate section 21, article I of the constitution, providing that the property of no person shall be taken or damaged for public use without just compensation therefor.

APPEAL from the district court for Washington county: CHARLES T. DICKINSON, JUDGE. *Affirmed.*

*E. J. Jackson,* for appellants.

*Walton & Mummert, contra.*

LETTON, C.

In 1883 the county board of Washington county, acting in conjunction with the county board of Burt county, caused to be constructed a drain or ditch from a point in the county of Burt, in a south and southeasterly direction through the county of Washington, to an intersection with a natural water course known as Fish creek. Fish creek at that time emptied into the Missouri river, a short distance below the city of Blair. The ditch as

originally dug had several lateral or spur ditches connecting with it for the purpose of draining the lands lying to the westward of the main ditch, the spur or lateral which is considered in this case being known as York creek spur ditch or spur ditch numbers 10 and 11. The ditch as originally constructed was from 8 to 12 feet wide at the top, about 6 feet wide at the bottom and from 6 to 8 feet deep. The land lying to the west of the ditch is high and rolling, while the land through which the ditch passes and through which Fish creek ran from the intersection of the ditch to where it emptied into the Missouri river is low and flat, and in many places stagnant water, in times of heavy rains, accumulates thereon. For a number of years after its construction, the main and spur ditches were cleaned out within the county of Washington by that county, the evidence showing that four years ago the witness George Sutherland was paid $700 by the county for cleaning out spur ditch number 11. The creeks and water courses running from the westward toward the line of the ditch have a fall of 12 or 14 feet to the mile, and, in times of heavy rains, water is discharged into the lower country where the ditch lies with great force and rapidity. From the point where the water strikes the low lands to the Missouri river, a distance of about 8 or 9 miles, the land is almost level and the fall is only from 12 to 16 inches to the mile. The original ditch and spur ditches not being of sufficient capacity to carry off and discharge the flood waters flowing from the west, as a natural consequence, when these waters, heavily charged with silt and alluvium, spread out upon the lower land and their flow was checked, the solid matter held in suspension settled, and a deposit of alluvium has been made extending for about a half mile east of the bluffs and for 5 or 6 miles north and south, to the depth of about from 2 to 4 feet above the original surface. The main and spur ditches became so filled with this deposit that the waters flow in a meandering channel partly upon the line of the old ditches and partly outside, their course depending upon

the nature and amount of the obstruction in the ditches. The bed of Fish creek below the point of intersection of the ditch became largely filled with the accumulation of matter brought down from above, so that it became shallow and did not afford sufficient drainage capacity for the waters flowing into it.

In March, 1903, a petition was filed with the board of supervisors of Washington county under the provisions of the drainage law, being sections 1-28, article I, chapter 89, Compiled Statutes (Annotated Statutes, 5500-5527). This petition was signed by W. G. Howell and others. It set forth that the petitioners were the owners of lots and lands which will be benefited by the ditch, drain and improvement prayed for, and prayed the board to cause "the present Fish creek ditch situated in Washington county, Nebraska, and commonly known as the Fish creek ditch improvement, to be straightened, widened, altered and deepened as follows from (here describing courses and distances). Also that spur ditches numbers 10 and 11 be straightened, widened, altered, and deepened from (describing courses and distances). Also that the board cause to be located and constructed a new ditch commencing at the termination of the present Fish creek ditch and running thence in a south and southeasterly direction (describing courses and distances) to the Missouri river." The petition further sets forth the necessity for such improvements. A bond was filed with the petition according to law. The county board made an actual view of the line of the ditch, made some minor changes regarding its location and dimensions, made the necessary findings that it was conducive to the public health, convenience and welfare, and employed an engineer to survey, level and stake the ditch and to make the report, profile and plat and return the schedule provided for by law. The apportionment made by the engineer was adopted and approved by the board except as to one small item. Following the filing of the engineer's report, the county clerk fixed the 17th day of October, 1903, at

the county clerk's office in Blair, Nebraska, as the time and place for the hearing of the same, and personal notice to resident landholders and notice by publication to non-residents was given as the statute provides. The board met at the time and place fixed in the notice and proceeded to hear objections to the reports and claims for compensation and made findings and adjudications as to all such matters.

After this had been done the plaintiffs, Nelson Morris and John H. Cameron, for themselves and on behalf of all other persons similarly situated, brought this action for the purpose of enjoining the county of Washington and the board of supervisors of said county from making any contract for the construction of the ditch, from determining at what time and in what number of assessments they would require the plaintiff to pay the sums charged against their land, from ordering that such assessments be placed upon the tax books against said lands, from going upon or authorizing any person to go upon the plaintiffs' land for any purpose, except to move obstructions from the ditches heretofore constructed, and asking that the proceedings of the board of supervisors be adjudged and determined null and void. A number of reasons are alleged why the proceedings are void and of no effect, but in the briefs and at the hearing before the court two grounds are mainly relied upon. First, it is urged that where it appears that a county has failed to perform its duty and keep existing ditches, constructed under the provisions of sections 24, 25 and 26 of the act, free from dirt and debris, no power is conferred upon the county board to assess the cost of cleaning out such ditches or keeping them free from obstructions under the guise of straightening, widening, altering or deepening them. The correctness of this contention is so clear that the proposition requires no argument to support it. If the evidence showed that the original Fish creek ditch, which was a ditch in two counties, was of sufficient capacity to perform the duty for which it had originally

15

been constructed, provided it had been kept cleaned out, then, certainly, the county board would have no authority to charge the duty of cleaning it upon the abutting owners, under the pretext of straightening, widening, altering or deepening it. We are satisfied, however, from the testimony in this case, that the evil which it was sought to remedy actually exists, and that the inadequate provisions made by the construction of the first ditch have failed to afford the necessary relief. By the report of the engineer, which has been adopted by the board, it would seem that instead of a ditch from 8 to 12 feet wide at the top, 6 feet wide at the bottom, 6 to 8 feet deep, as the original ditch was, being sufficient to properly drain the territory sought to be benefited it will require such a ditch as proposed, which will be at the point of com mencement, 31 feet wide at the top, 16 feet wide at the bottom and 8.13 feet deep, and is to be gradually widened and deepened until it shall be 35 feet wide from the junction of spur ditch number 11, until it reaches the Missouri river, and be 12.58 feet deep at the Missouri river, and that Fish creek itself shall be straightened, deepened and widened from the end of the original Fish creek ditch throughout its course from that point to the Missouri river and be made to empty into the river at a new place. This contemplates a vastly different enterprise from the mere cleaning out of the old ditches, and, from the testimony as to the conditions, it seems clear that nothing less than a work of similar magnitude would be of any avail to carry off the floods of water which descend during heavy rains in that locality. We are of the opinion, therefore, that this objection is not tenable and that the county board were acting in strict good faith when they adopted the improvement, and did not do so merely as a pretext in order to clean out the old ditches at the expense of the adjoining landowners.

The next objections urged are that, assuming that the act is valid, it confers no authority to exercise the power

of eminent domain, because it makes no provisions for raising money by taxation or otherwise, to pay for lands taken or damaged, and that no provision has been made for such payment in the proceedings sought .to be enjoined. And, further, it is urged that the act is unconstitutional because it purports to exercise the power of eminent domain, and makes no provisions for the payment of property taken or damaged.

The constitutionality of the act as a whole has been attacked in this court at least twice, and has sucessfully withstood the assault. *Darst v. Griffin,* 31 Neb. 668; *County of Dodge v. Acom,* 61 Neb. 376. In neither of these cases, however, was the precise point raised in this case argued or considered by the court, hence it will be necessary for us to consider whether the proceedings which are attacked are void or whether the act itself is vulnerable to the objection of unconstitutionality, for the reasons assigned by the plaintiffs in error.

It is argued that under the law, if the county board find for the proposed improvement, they shall cause the engineer to make a return and schedule of the lots and lands that will be benefited and an apportionment of the number of lineal feet and cubic yards to each tract of land, and so forth, according to the benefits which will result to each from the proposed improvement, and an estimate of the cost of location and construction to each and a specification of the manner in which the improvement shall be made and completed, but that this report and estimate takes no account of compensation for land taken or damaged. It is said that the engineer does not take into consideration compensation to the landowners. By sections 12 and 13, persons whose lands are taken or affected may file their claim for damages and the commissioners on actual view shall fix and allow such compensation and damages as may accrue. But it is urged that no method is provided for paying such compensation or damages in any manner whatever, and that in this case the land of the plaintiff Cameron is taken without

any provisions for compensation and no authority of law
to make provision for compensation.

It is the settled doctrine of this court that the just com-
pensation required by section 21, article I of the consti-
tution, to be made for taking or damaging private property
for public use must, before such taking, be ascertained
and payment made; either by the appropriation of money
from the proper fund for such purpose, or by a levy of
sufficient taxes to pay the damages, upon which a warrant
may be drawn. Until the compensation of the landowner
has been made sure and certain, he may not be compelled
to give up his property, and the public use of the same
may be enjoined. *Zimmerman v. County of Kearney,* 33
Neb. 620; *Livingston v. Johnson County,* 42 Neb. 277. If
in the course of the procedure provided for by the statute,
the time has not arrived by which the provision for the
payment of compensation is to be made by the county
board, and in the act there is to be found a means where-
by a fund is to be created for that purpose, the plaintiff
cannot at this time maintain this action, for it will be
presumed that the county officers charged with the duty
of assessing taxes for his benefit will proceed at the
proper time to do so, and until it becomes impossible he
will not be heard to complain. But if in the act there is no
provision made for a fund from which to pay the damages
which he has suffered, then the whole proceedings must
fail, and they may be attacked at any stage.

It is evident from an inspection of the act as a whole,
that it was provided by the legislature that all persons
whose property would be taken or damaged by the pro-
posed improvement shall have notice of that fact, and
shall have an opportunity to have a hearing upon the
question of the amount of their damages.

Section 13 provides that the commissioners, on actual
view of the premises, shall fix and allow such compensa-
tion for land appropriated, and assess such damages as
will in their judgment accrue from the construction of
the improvement, to each person or corporation making

application as provided in section 12, and, without such application, to each idiot, insane person or minor owning lands taken or affected by such improvement.

Section 14 provides that exceptions may be filed to the apportionment, or to any claim for compensation or damages, and for the hearing of testimony, and power is given to compel the attendance of witnesses. In other sections an appeal to the district court is allowed from any final order or judgment in these proceedings, and provision is made that no appeal shall affect the progress of the construction of the proposed improvement, provided the petitioners shall enter into a good and sufficient bond, to be approved by the clerk of the district court or the judge thereof, conditioned for the payment of all damages and costs that the appellant may sustain on the trial of the appeal. It is provided that the clerk of the district court shall certify to the board of county commissioners a full and complete transcript of the proceedings had upon such appeal in the district court.

Section 18 provides that immediately after the transcript is returned to the county clerk, or immediately upon the filing of the bond mentioned, or in case there is no appeal, then immediately after the hearing of the report of the engineer, the commissioners shall advertise for bids for the construction of the work, which bid shall not exceed the estimated cost.

Section 21 is as follows: "When the working sections are let, as hereinbefore provided, and the cost and expenses of location and construction, and all compensation and damages are ascertained, the commissioners shall meet and determine at what time and in what number of assessments they will require the same to be paid, and order that the assessments as made by them be placed on the duplicate tax list against the lots and lands so assessed."

Section 22 provides for an order to the county clerk to make and furnish to the treasurer a tax duplicate with the assessment arranged thereon as required by their order,

and provides that the unpaid assessment shall be a perpetual lien on the premises assessed and for the collection of the same in the usual manner by the county treasurer.

From a consideration of these provisions, it appears that the county commissioners have no power to enter into a contract for the construction of the proposed improvement until after the allowance of damages or compensation to the landowner, and the final determination by the district court of any appeal from the decision of the county board upon the same, unless the petitioners for the improvement have filed a good and sufficient bond with the clerk of the district court for the payment of all damages and costs that the appellant may sustain, when, it is provided, the work of construction may proceed. After the contract has been let, and after the determination of the amount of damages which have been suffered by landowners, the whole amount of the cost of the proposed improvement is known to the county board, save for the contingency that the amount of damages adjudged to be paid may be changed upon appeal. Up to this time it would have been impossible for them to make an assessment for the costs of the improvement, since only one of the two necessary factors would have been within their knowledge. Then, and not until then, could they act intelligently, and the law, recognizing this, provides, in section 21, that after these matters are ascertained the commissioners shall meet and determine at what time and in what number of assessments they shall require the same to be paid, and shall order that the assessments as made by them be placed on the tax list against the lots and lands assessed.

It is argued by the plaintiffs in error that the statute does not confer power to impose a tax, that in all probability one or more sections were omitted in the preparation and passage of this act, and that the drainage statutes of a number of other states provide absolutely and specifically for compensation for land taken and the assessment and levy of a tax for that purpose. The law

under consideration, while it does not say in so many words that the commissioners shall make an assessment, requires them, after the cost of location, construction, compensation and damages have been ascertained, to meet to determine at what time and in what number of assessments they will require the same to be paid, and that they shall order that the assessments as made by them be placed on the tax list. When the proportionate benefit to each tract has been ascertained, when the commissioners know the total amount of money which it is necessary to raise, when they have determined the number of assessments in which this sum of money is required to be paid, and the times of payment, and when they order these assessments to be placed upon the tax list, what is there lacking of a complete assessment? In Black's Legal Dictionary, assessment is defined as follows:

"Assessment, in a general sense, denotes the process of ascertaining and adjusting the shares respectively to be contributed by several persons toward a common beneficial object according to the benefit received. Assessment in taxation: The listing and valuation of property for the purpose of apportioning a tax upon it, either according to value alone or in proportion to benefit received. Also determining the share of a tax to be paid by each of many persons; or apportioning the entire tax to be levied among the different taxable persons, establishing the proportion due from each."

When a tax-levying officer knows the proportionate benefit to each tract, the amount of money necessary to be raised for a special improvement, and when he has determined the number of payments in which it shall be paid and the time of payment of the same, and has ordered these determinations placed upon the tax list for collection by the proper officers, he has made an assessment. When these acts are performed, the assessment is made and the fact that the statute provides in detail that the commissioners shall do the several acts which constitute an assessment is no less effectual than if it had stated in

general terms that the board should make an assessment
and then had specified the manner of procedure.

It may be objected that the landowner has not had an
opportunity to be heard upon the question as to whether
his land has been specially benefited to the extent of the
amount necessary to be levied to compensate the land-
owner for land taken or damaged. But the statute (sec-
tion 8) provides that after the engineer has made his
report to the county board, in which report he is required
to make "an apportionment of a number of lineal feet and
cubic yards to each lot, tract of land, road, or railroad,
according to the benefits which will result to each from the
improvement, and an estimate of the cost of location and
construction to each," the county clerk shall fix a day for
the hearing of the same and shall give a notice which
shall set forth a tabular statement of the apportionment
as made by the engineer in his report, and that, *before* the
day set for hearing, all persons whose lands are taken or
affected shall make application for compensation or
damages. These provisions enable each landowner, on the
day set for hearing of the report, to know just what pro-
portionate amount the engineer has found that his land
has been benefited by the proposed improvement, and also
to know what is the total amount of compensation for
lands taken, or damaged, claimed by landowners along the
line of the ditch. When he knows these two facts he is
apprised of the utmost amount to which his land may
become liable to be assessed, and he has the right to be
heard upon the making of such assessment before the
board at the hearing. It is evident that the amount of
damages allowed as compensation to landowners must be
apportioned by the county board upon the land affected
according to benefits, and in the same ratio as to the
amount levied upon each particular tract of land, as the
apportionment of lineal feet and cubic yards, and the cost
of location and construction are apportioned.

Before the report is finally confirmed by the board, all
parties have had an opportunity to be heard upon all

questions affecting their interests, and at the time of hear-
ing they have full and adequate information in regard to
the estimated cost of construction and location and the
entire amount claimed as compensation for land taken or
damaged.    No further hearing is necessary during the
further course of the proceedings, since all questions in
which the landowner is interested may be passed upon at
this time.    The landowner therefore has had his day in
court and his property is not taken without due process
of law.    The compensation and damages are apportioned
as to benefits and upon the same basis as the cost of con-
struction and location.

It is objected that the damages allowed may be largely
increased upon appeal to the district court  nd that no
means have been provided whereby the increased compen-
sation may be provided.    But the commissioners are not
required to make the assessment until the final judg-
ment in the district court has been certified to the county
clerk.    By section 16, however, it is provided that the
work shall not be delayed if the petitioners shall give a
bond, conditioned for the payment of all damages and
costs that the appellant may sustain.    But it is said that
the landowner should not be compelled to look for his
compensation to the uncertainties of a suit upon a bond
of a private citizen.    To this we assent.    The county is
the party that is primarily responsible to the landowner
for the damages which he has sustained.    It has made a
special assessment by which to raise a fund out of which he
is to be paid.    He is entitled to look to the county for his
compensation.    The county, however, may look to the
petitioners, and their sureties under the conditions of
their bond, to pay all damages and costs that the court
may find the landowner entitled to, above the amount of
the original allowance which has been assessed against
the property specially benefited.    While this manner of
providing for the contingency of the damages being in-
creased upon appeal may seem somewhat clumsy, it is
the county alone that may suffer from being compelled to

bring an action upon the bond. The landowner cannot complain in this regard, since his right to recover is not from the petitioners but from the county. The provisions of sections 21 and 22 providing for the means of compensation and furnishing the method of determining the amount of each assessment, the time it shall be paid, and the method of collection, are sufficient to accomplish the desired end, when taken in connection with the apportionment according to benefits to each particular lot or tract of land reported by the engineer and confirmed by the board.

In this action the question of whether or not there were irregularities or errors of judgment in the proceedings of the county board cannot be inquired into. It is an original action based upon the idea that the board had no jurisdiction to act. Since we have come to the conclusion that the objections to the jurisdiction of the board urged by the plaintiff in error are not well taken, the judgment of the district court was right and should be affirmed.

AMES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.